# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                      )
ARIANA KLAY, *et al.*,                )
                                      )
                    Plaintiffs,       )
                                      )
          v.                          )          Civil Action No. 12-0350 (ABJ)
                                      )
LEON PANETTA, Secretary of            )
Defense, *et al.*,                    )
                                      )
                    Defendants.       )
_____)

## MEMORANDUM OPINION

Plaintiffs Ariana Klay, Elle Helmer, Nicole McCoy, Robin Kahle, Lamanda Cummings, Rebecca Blumer, Erica Dorn, Mariel Marmol, Christian Everage, Eric Pratt, Janet Galla, and Carla Butcher have filed this action against defendants Leon Panetta, Secretary of Defense; Robert M. Gates and Donald Rumsfeld, former Secretaries of Defense; James F. Amos, Commandant of the Marine Corps; James T. Conway and Michael W. Hagee, former Commandants of the Marine Corps; Ray Mabus, Secretary of the Navy; and Donald C. Winter and Gordon England, former Secretaries of the Navy, under *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), alleging violations of their First, Fifth, and Seventh Amendment rights. Defendants have moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The Court will grant defendants' motion because Supreme Court precedent requires it to abstain from inferring a *Bivens* remedy for plaintiffs, and because defendants are entitled to qualified immunity.

## BACKGROUND

Plaintiffs are eleven women and one man who allege that while serving in the U.S. Armed Forces, they were "raped, sexually assaulted, stalked, . . . and severely harassed" and then victimized again when they were humiliated and retaliated against for reporting the offenses perpetrated against them.  Am. Compl. [Dkt. # 3] ¶¶ 6–180.  All plaintiffs were on active duty when they suffered these sexual assaults and retaliatory actions at the hands of other service members.  *Id.*  Most of the attacks detailed in the complaint took place on military bases, military ships, or during foreign deployment.  *Id.* ¶¶ 32–33, 40, 51, 75–76, 86, 97, 109–10, 146.  Others occurred at private residences that were located off-base or in connection with social events with other service members.  Am. Compl. ¶¶ 10, 63–64, 134, 168.

Plaintiffs have brought a *Bivens* suit for monetary damages against the current Secretary of Defense and two who came before him, the Commandant of the Marine Corps and his two predecessors, and the Secretary of the Navy and his two predecessors, alleging that they caused plaintiffs' injuries by creating and maintaining a hostile military environment that permitted sexual assault and retaliation to continue unabated.  Am. Compl. ¶ 5.  Specifically, plaintiffs contend that defendants:

- failed to implement certain congressional and statutory mandates designed to reduce sexual assault in the military, Am. Compl. ¶¶ 212, 216–22;

- "lack[ed] . . . leadership" in the face of a known climate that condoned and perpetuated violence and retaliation against service members, Am. Compl. ¶ 194;

- failed to take "*any* steps, let alone systemic and effective steps, to identify and punish the personnel who retaliated against those courageous enough to report rape and sexual assault," Am. Compl. ¶ 199;

- granted moral waivers that permit felons to serve in the military, Am. Compl. ¶ 200;

- "presided over a dysfunctional system that permits all but a small handful of rapists to evade any form of incarceration," Am. Compl. ¶ 202;

- allowed military Command to interfere with the impartiality of criminal investigations, Am. Compl. ¶ 207;

- accepted nonjudicial punishment of alleged violators, Am. Compl. ¶ 208;

- allowed alleged rapists to be charged with adultery instead of rape, Am. Compl. ¶ 209;

- ensured that military (not civilian) authorities investigated and prosecuted rape and sexual assault charges, Am. Compl. ¶ 210;

- permitted accused rapists and sexual assailants to be honorably discharged, Am. Compl. ¶ 211;

- failed to accurately report the conviction rates of rape in the military, Am. Compl. ¶ 213; and

- permitted the destruction of forensic evidence, Am. Compl. ¶ 214.

Plaintiffs claim that these alleged acts and omissions directly resulted in a series of constitutional deprivations, and they allege violations of the following rights:

(1) a substantive due process "right to bodily integrity" under the Fifth Amendment, Am. Compl. ¶¶ 223–26;

(2) a procedural due process right to "justice" and to be free from unfair termination and mistreatment under the Fifth Amendment, Am. Compl. ¶¶ 227–30;

(3) an equal protection "right to be free from rape, sexual assault and sexual harassment under the Fifth Amendment," Am. Compl. ¶¶ 231–34;

(4) a First Amendment right to report sexual assault, sexual harassment and rape without suffering retaliation and adverse employment actions, Am. Compl. ¶¶ 235–37; and

(5) a claimed Seventh Amendment right to have a jury decide the fate of those who victimized them, Am. Compl. ¶¶ 238–40.

Defendants have moved to dismiss the case under Fed. R. Civ. P. 12(b)(6) on the grounds that Supreme Court precedent requires the Court to abstain from inferring a *Bivens* remedy for plaintiffs injured in the course of activities incident to military service, and that defendants are entitled to qualified immunity. Defs.' Mot. to Dismiss [Dkt. # 4] at 1–2. Plaintiffs maintain that their case is not barred by the abstention doctrine and that they have pled sufficient facts to overcome defendants' entitlement to qualified immunity. Pls.' Opp. to Defs.' Mot to Dismiss

3

[Dkt. # 7] ("Pls.' Opp."). On November 5, 2012, the Court held a hearing on defendants' motion.

## STANDARD OF REVIEW

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." 556 U.S. at 678. And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

When considering a motion to dismiss under Rule 12(b)(6), the complaint is construed liberally in plaintiff's favor, and the Court should grant plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept

plaintiff's legal conclusions.  *See id.*; *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citations omitted).

## ANALYSIS

This case raises many important public policy issues.  But the issue before the Court is not whether the culture described in the complaint exists, whether it is deplorable, or whether plaintiffs suffered harm at the hands of the perpetrators of these criminal acts and those who sheltered them from justice or further victimized plaintiffs.  The factual recitations, which the Court must accept as true at this juncture, describe brutal and criminal assaults, compounded by a degrading and humiliating institutional response, and they depict an unacceptable environment in need of repair from the top down.  But the question posed by the defense motion is whether a court has the power to provide the particular sort of remedy sought here for the specific injustices alleged in the complaint.  That is a purely legal question, and its answer is no.

A *Bivens* cause of action allows a plaintiff to recover damages from a federal official who violates his or her constitutional rights, even in the absence of a federal statute authorizing such

relief.[1]  A plaintiff may not recover under *Bivens,* though, if there are "special factors counseling hesitation in the absence of affirmative action by Congress," or if the defendant is entitled to qualified immunity.  *United States v. Stanley*, 483 U.S. 669, 678 (1987), quoting *Bivens*, 403 U.S. at 396; *see also Iqbal*, 556 U.S. at 677.  Defendants contend that plaintiffs' claims are barred by both the "special factors counseling hesitation" when a *Bivens* action is brought against military officials and qualified immunity.  Defs.' Mem. In Supp. of Mot. to Dismiss [Dkt. # 4] ("Defs.' Mem.") at 3.  Even assuming the veracity of all of plaintiffs' allegations, after reviewing the relevant legal precedent, the Court concludes that this complaint must be dismissed.  As the Supreme Court has made clear:  "judges are not given the task of running the Army."  *Chappell v. Wallace*, 462 U.S. 296, 301 (1983), citing *Orloff v. Willoughby*, 345 U.S. 83, 93–94 (1953); *see also Cioca v. Rumsfeld*, No. 1:11-cv-151, *appeal docketed*, No. 12-1065 (4th Cir. Jan. 13, 2012).

## I.  Abstention

In *Feres v. United States*, 340 U.S. 135 (1950), the Supreme Court held that "the Government is not liable under the Federal Tort Claims Act ["FTCA"] for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service."  *Id.* at 146.

---

1    The Supreme Court has authorized suits for damages against federal officials for violations of an individual's rights under the Fourth Amendment, *Bivens*, 403 U.S. at 396, the Fifth Amendment, *Davis v. Passman*, 442 U.S. 228, 248–49 (1979), and the Eighth Amendment, *Carlson v. Green*, 446 U.S. 14, 17–18 (1980).  "Because implied causes of action are disfavored, the Court has been reluctant to extend *Bivens* liability 'to any new context or new category of defendants.'"  *Iqbal*, 556 U.S. at 675, quoting *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001); *see also Bush v. Lucas*, 462 U.S. 367 (1983) (declining to extend *Bivens* to a claim based on a violation of the plaintiff's First Amendment rights).  Defendants have not challenged whether the alleged violations of plaintiffs' First and Seventh Amendment are actionable under *Bivens*, so the Court will assume without deciding that *Bivens* extends to those violations.  *See Iqbal*, 556 U.S. at 675 (assuming without deciding that the respondent's First Amendment claim was actionable under *Bivens* where the petitioners did not raise the issue of whether a *Bivens* remedy was available for such violations).

"The *Feres* doctrine cannot be reduced to a few bright-line rules; each case must be examined in light of the statute as it has been construed in *Feres* and subsequent cases." *United States v. Shearer*, 473 U.S. 52, 57 (1985). After *Feres,* the Supreme Court extended the doctrine to the *Bivens* context. It held that the "unique disciplinary structure of the Military Establishment and Congress's activity in the field" are "special factors" that require courts to abstain from inferring a *Bivens* remedy "for injuries that 'arise out of or are in the course of activity incident to service.'" *Stanley*, 483 U.S. at 683–84 (citations omitted); *see also Chappell*, 462 U.S. at 299. Thus, the question presented by this case is whether the "injuries" for which plaintiffs seek to hold defendants responsible arose out of, or occurred in the course of, "activity incident to" military service.

Plaintiffs oppose the motion to dismiss, and they protest that being victimized by a sexual assault cannot possibly be considered to be an "activity" incident to military service. Pls.' Opp. at 1, 17. But whether being raped is an "activity" incident to military service is not the relevant inquiry; the question is: what is the source of the alleged injury? The complaint specifically asks that plaintiffs be compensated for the harm they suffered – including the assaults themselves – which they claim flowed from the defendants' alleged mismanagement of the military. In other words, the assaults are the alleged "injury," not the "activity." Moreover, plaintiffs' opposition is not supported by the applicable authorities.

A.  <u>Plaintiffs' Injuries Arose Out Of Or Were In The Course Of Activity Incident To Service</u>

How should a court go about deciding whether a plaintiff's injuries occurred in the course of activities incident to his or her military service? In applying the "incident to service" test after *Feres,* courts have considered the service member's "[1] duty status, [2] the site of the injury and [3] the nature of the activity engaged in by the service member at the time of his injury."

*Schnitzer v. Harvey*, 389 F.3d 200, 203 (D.C. Cir. 2004) (citations omitted).   No one factor is dispositive; the court "must consider the totality of the circumstances surrounding the injury and distinguish between those cases involving activities arising from life on the military reservation and those in which the presence on the base has little to do with the soldier's military service." *Stanley v. CIA*, 639 F.2d 1146, 1151 (5th Cir. Mar. 1981) (internal quotation marks and citation omitted) (the Supreme Court declined to reexamine the Fifth Circuit's ruling on the service incidence issue in a subsequent appeal, *Stanley*, 483 U.S. at 680).   Here, the plaintiffs' injuries had everything to do with their military service, and at bottom, the case is about nothing else but "life on the military reservation."   But in order to rule on defendants' motion more fully, it is useful to survey the development of the *Feres* doctrine and to review how it has been applied in the *Bivens* context.

In *Brooks v. United States*, 337 U.S. 49, 51–53 (1949), two soldiers who were on furlough were riding in their car along a public highway when they were struck by a United States Army truck driven by a civilian employee of the Army.   The injured soldier and the estate of the soldier who died in the accident sued the United States under the FTCA alleging negligence on the part of the driver.   *Id.* at 50.   The Supreme Court held that the soldiers could recover under the FTCA because the accident was not "incident to" the soldiers' military service: the accident "had nothing to do with the Brooks' army careers, [and the] injuries [were] not caused by their service except in the sense that all human events depend upon what has already transpired."   *Id.* at 52.

Subsequently, in *Feres*, the Supreme Court addressed three more FTCA cases involving the military, and it distinguished them from *Brooks*.   In the first case, the estate of a soldier who died in a fire in the barracks sued the government for negligence.   It alleged that the government

quartered the soldier in barracks it knew or should have known were unsafe because of a defective heating plant, and that it failed to maintain an adequate fire watch. *Feres*, 340 U.S. at 136–37. The second and third cases involved suits for injuries incurred by service members as a result of negligent medical treatment by army surgeons. *Id.* at 137. The Supreme Court held that all of the soldiers' injuries arose from activity incident to service because they were all "on active duty and not on furlough [and] sustained injury due to negligence of others in the armed forces." *Id.* at 138–39.

In *United States v. Brown*, 348 U.S. 110, 110 (1954), a serviceman was honorably discharged after suffering a knee injury while on active duty. After his discharge, he sought treatment for his knee at a Veterans Administration hospital. *Id.* During an operation, the VA hospital allegedly used a defective tourniquet and permanently injured the knee. *Id.* at 110–11. The veteran brought a FTCA suit against the government for the injury suffered at the VA hospital. *Id.* at 111. The Supreme Court held that the former serviceman's suit was governed by *Brooks* and not *Feres* because he was suing for injuries "not incurred while [he] was on active duty or subject to military discipline." *Id.* at 112. It noted that "the injury occurred after [the planitiff's] discharge, while he enjoyed civilian status." *Id.* at 112. Thus, that plaintiff was allowed to recover under the FTCA. *Id.* at 112–13.

The Supreme Court went on to apply the *Feres* doctrine in the *Bivens* context in *Chappell* and *Stanley*. In *Chappell*, enlisted men brought a constitutional claim under *Bivens* against their superior officers, alleging that the superiors had discriminated against them on the basis of race when making duty assignments, evaluating their performance, and imposing penalties. 462 U.S. at 297. Looking to *Feres* for guidance, the Court found that the case presented the "special factors counseling hesitation" before fashioning a *Bivens* remedy, *id.* at 298–99, and it held that

"enlisted military personnel may not maintain a suit to recover damages from a superior officer for alleged constitutional violations." *Id.* at 305.  The Court explained:

> The need for special regulations in relation to military discipline, and the consequent need and justification for a special and exclusive system of military justice, is too obvious to require extensive discussion; no military organization can function without strict discipline and regulation that would be unacceptable in a civilian setting . . . .  The Court has often noted "the peculiar and special relationship of the soldier to his superiors," . . . and has acknowledged that "the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty . . . ."
>
> ***
>
> Civilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers; that relationship is at the heart of the necessarily unique structure of the military establishment.

*Id.* at 300 (citations omitted).

In *Stanley*, a soldier volunteered for what was ostensibly to be a chemical warfare testing program, but in which he was secretly administered lysergic acid diethylamide ("LSD") as part of an Army plan to test the effects of the drug on human subjects.  483 U.S. at 671.  The soldier suffered severe side effects which led to his discharge and the dissolution of his marriage.  *Id.* Upon learning that he had been given LSD, he sued the U.S. government under the FTCA "alleging negligence in the administration, supervision, and subsequent monitoring of the drug testing program."  *Id.* at 672.  He also brought a *Bivens* suit against unknown federal officers for violations of his constitutional rights.  *See id.*  However, the Supreme Court refused to infer a *Bivens* remedy for the service member because the issue of whether the injuries were incident to

his service had been decided against him by the Fifth Circuit years before.  *Id.* at 680.[2]  In his case before the Court of Appeals, the veteran had argued that his participation in the medical experiment should not be considered "'activity incident to service' because he was a volunteer and had been given a release from his regular duties in order to participate in the program . . . [and] the Government's activity . . . was illegal and thus should not be covered by the *Feres* doctrine."  *Stanley,* 639 F.2d at 1150.  The Fifth Circuit rejected these arguments and held that the plaintiff's injuries were incident to military service because "the relationship between Stanley and the allegedly negligent individuals stemmed from their official military relationship," he was subject to military control throughout the duration of his participation in the program, he was receiving military pay, and he was promised a letter of commendation for his participation in the program.  *Id.* at 1150–52.  The court was not swayed by the fact that the activity that directly caused the harm was illegal.

Plaintiffs assert that their case is similar to *Brooks* and *Brown* and unlike *Feres* and *Stanley*.  However, just as the Supreme Court observed in *Feres,* the "actual holding in the *Brooks* case can support liability here only by ignoring the vital distinction" between that case and the case at hand, 340 U.S. at 146, and the same can be said of *Brown*.  In *Brooks* and *Brown*, the plaintiffs incurred their injuries while on furlough or after discharge.  That is not the case here.  Rather, like the plaintiffs in *Feres* and *Stanley*, plaintiffs in this case were all on active duty, under compulsion of orders, subject to military control and discipline, and receiving

---

2       Plaintiffs' assertion that the "Supreme Court [in *Stanley*] noted that – if it were to review the issue *de novo* – Plaintiff Stanley may be able to show that the Constitutional deprivation was not incident to service.  (Stanley argued that no military purpose had been shown.)" is erroneous.  *See* Pls.' Opp. at 16.  The *Stanley* Court did not state that a *de novo* review might allow Stanley to show that his injuries were not "incident to service."  Rather, it said that the "issue of service incidence, as that term is used in *Feres*, was decided adversely to [the serviceman] by the Court of Appeals . . . and there is no warrant for reexamining that ruling here."  *Stanley*, 483 U.S. at 680 (citations omitted).

military pay when they incurred their injuries.  Most important, the connection between plaintiffs and those who they claim caused their injuries stemmed from their military relationship and the military system of justice, and plaintiffs expressly attribute their injuries to the manner in which the military leaders executed their responsibilities.  Am. Compl. ¶¶ 194, 199, 200, 202, 207–214, 216–22.  The fact that a couple of the plaintiffs were "off-duty" at the time of the actual assaults is not determinative because "[t]he relevant distinction . . . runs between service-persons who are on 'active duty' and those who have been discharged or are on furlough, not between 'off-duty' and 'on-duty' service-persons."  *Schnitzer*, 389 F.3d at 204, quoting *Persons v. United States*, 925 F.2d 292, 296 n.6 (9th Cir. 1991).  Additionally, the fact that most of the alleged acts of retaliation and the sexual assaults themselves occurred on military bases or ships, during a foreign deployment, or in connection with social events with other service members further distinguishes this case from *Brooks* and *Brown,* where the injuries arose when plaintiffs were off-base engaged in wholly personal business.[3]

Plaintiffs also insist that rape and retaliation cannot be found to be incident to military service because those are "illegal" acts that further no military function or purpose.  Pl.'s Opp. at 14–18, 20.  But the Fifth Circuit was not persuaded by that contention in *Stanley*. 639 F.2d at 1152 (barring the service member's claims based on the *Feres* doctrine despite the argument that the activity in question was "patently illegal").  And *Feres* held that the servicemen's injuries in the three cases involved there were "incident to service" even though the harmful conduct at

---

3       The fact that two of the sexual assaults occurred off-base at a private residence, Am. Compl. ¶¶ 10, 133–34, is not determinative.  *See Shearer*, 473 U.S. at 57 (holding that recovery for a murder that occurred while the victim was "was off duty and away from the base" was barred by the *Feres* doctrine because the case struck at the core of the concerns underlying the *Feres* doctrine).  Even the plaintiffs who were assaulted beyond the boundaries of the base were on active duty at the time.  And, as is the case with the other plaintiffs, their case directly implicates the concerns underlying the *Feres* doctrine.

issue – medical malpractice and negligence in fire prevention – certainly furthered no military purpose or function. *See Feres*, 340 U.S. at 136–38. Plaintiffs also argue that "a constitutional right violation is never within the discretion of a military officer." Pls.' Opp. at 19–20. Therefore, "judicial inquiry into constitutional rights violations occurring in the military can never intrude on a matter that is purely within the military affairs." *Id.* at 20. But the Supreme Court's decision to apply the abstention doctrine in *Chappell* and *Stanley* is at odds with that assertion.

Plaintiffs attempt to differentiate their case from *Chappell* by arguing that their claims against top defense department officials do not directly raise military discipline or chain of command issues, but the Supreme Court has already rejected a similar argument. In *Stanley*, the plaintiff attempted to distinguish his case from *Chappell* by asserting that the "defendants in [his] case were not [his] superior military officers, and indeed may well have been civilian personnel, and that the chain-of-command concerns at the heart of *Chappell* . . . [were] thus not implicated." 483 U.S. at 679. The Court responded that to give controlling weight to those specific facts would ignore the *Chappell* Court's reliance on *Feres*, where the officer-subordinate relationship was not crucial to the decision. *Id.* at 680. But more important, even if one reads *Chappell* to require some sort of chain of command allegations before a case will be dismissed, it is hard to read this complaint without noting the numerous claims related to plaintiffs' treatment at the hands of their superiors, Am. Compl. ¶¶ 17, 31–32, 119, 196, and the allegations that specifically question how military justice is dispensed and military discipline is imposed, Am. Compl. ¶¶ 199, 208–09, 211.

Plaintiffs quote *Chappell* for the proposition that the Supreme Court "has never held . . . that military personnel are barred from all redress in civilian courts for constitutional wrongs

suffered in the course of military service." *Chappell*, 462 U.S. at 304. But that statement in *Chappell* does not alter the analysis here. First, the Court itself has placed the statement in context: "As the citations immediately following that statement suggest, it referred to redress designed to halt or prevent the constitutional violation rather than the award of money damages," which is the remedy that plaintiffs seek. *Stanley*, 483 U.S. at 683. Second, defendants here are not arguing that plaintiffs' case is barred by the *Feres* doctrine "merely because [plaintiffs] were servicemembers when they were raped and retaliated against for reporting rape." Pls.' Opp. at 10. Instead, defendants contend that plaintiffs' injuries were incident to their military service because those injuries are inextricably tied to their employment in the military. Defs.' Mem. at 9; Defs.' Reply at 4.

Indeed, plaintiffs expressly allege that their injuries were *caused* by a culture and hostile environment that was fostered by defendants. Am. Compl. ¶¶ 5, 194–97, 203, 206, 225, 233. This case is nothing like *Brooks* where men who happened to be soldiers happened to be involved in an accident that had nothing to do with their Army careers. Moreover, plaintiffs have not distinguished their case from those cases cited by defendants where courts have applied the *Feres* doctrine to bar claims based on sexual assault in the military nor have they provided examples of cases where such claims have been allowed to proceed. *See* Defs.' Mem. at 10–11, citing *Cioca v. Rumsfeld*, No. 1:11-cv-151, *appeal docketed*, No. 12-1065 (4th Cir. Jan. 13, 2012) (dismissing a case virtually identical to the case at hand based on the Supreme Court's decisions in *Chappell* and *Stanley*); *Matreale v. New Jersey Dep't of Military & Veterans Affairs*, 487 F.3d 150, 152–54 (3d Cir. 2007) (holding that a FTCA claim that superiors retaliated against the plaintiff for supporting a sexual assault claim by a fellow soldier was barred by *Feres*); *Mackey v. United States*, 226 F.3d 773, 774–77 (6th Cir. 2000) (finding that a FTCA claim that

superior officers sexually harassed the plaintiff was barred by *Feres*); *Smith v. United States*, 196 F.3d 774, 776–78 (7th Cir. 1999) (concluding that a FTCA claim that superiors negligently supervised a sergeant who allegedly raped the plaintiff was barred by *Feres*); *Davis v. Marsh*, 876 F.2d 1446, 1450 (9th Cir. 1989) (finding that a *Bivens* claim alleging sexual harassment by superior officers was barred by *Chappell*); *Bartley v. Dep't of the Army*, 221 F. Supp. 2d 934, 936, 948–49, 955–56 (C.D. Ill. 2002) (holding that FTCA and *Bivens* claims that superiors sexually assaulted and harassed the plaintiffs were barred by *Feres* and *Chappell*); *Morse v. West*, 975 F. Supp. 1379, 1380–82 (D. Colo. 1997) (holding that FTCA and *Bivens* claims alleging sexual harassment by ROTC personnel were barred by *Feres*).

Accordingly, the Court finds that plaintiffs' injuries arose out of, or were in the course of activity incident to, their military service. Therefore, binding precedent applying the *Feres* doctrine bars the creation of a *Bivens* remedy here.

B.  This Case Implicates The Public Policy Considerations Underlying The Abstention Doctrine

Plaintiffs argue nonetheless that the Court should not dismiss their case because doing so would not serve the purposes behind the *Feres* doctrine.  Pls.' Opp. at 19–21.  But as in the *Shearer* case, 473 U.S. at 57, that argument is unavailing here.

In *Shearer*, a soldier who was off duty and away from base was kidnapped and murdered by another serviceman.  473 U.S. at 53.  The soldier's mother sued the government under the FTCA alleging that the Army: knew that the murderer had been convicted of and sentenced for manslaughter years before; knew that he was dangerous; "negligently and carelessly failed to exert a reasonably sufficient control over" the murderer; and "failed to warn other persons that he was at large."  *Id.* at 54  (internal quotation marks omitted).  The Court of Appeals held that the murder was not incident to military service because the victim was "was off duty and away

from the base when he was murdered." *Id.* at 57.  The Supreme Court reversed, stating that "the

situs of the murder is not nearly as important as whether the suit requires the civilian court to

second-guess military decisions, and whether the suit might impair essential military discipline."

*Id.* (citations omitted).  In applying this standard, the *Shearer* Court explained that:

> [The] complaint strikes at the core of these concerns . . .  [and] goes
> directly to the "management" of the military; it calls into question basic
> choices about the discipline, supervision, and control of a serviceman.
> Respondent's case is therefore quite different from *Brooks v. United States*
> . . . where the Court allowed recovery under the Tort Claims Act for
> injuries caused by a negligent driver of a military truck. Unlike the
> negligence alleged in the operation of a vehicle, the claim here would
> require Army officers "to testify in court as to each other's decisions and
> actions."  To permit this type of suit would mean that commanding
> officers would have to stand prepared to convince a civilian court of the
> wisdom of a wide range of military and disciplinary decisions; for
> example, whether to overlook a particular incident or episode, whether to
> discharge a serviceman, and whether and how to place restraints on a
> soldier's off-base conduct.  But as we noted in *Chappell v. Wallace*, such
> "'complex, subtle, and professional decisions as to the composition,
> training, . . . and control of a military force are essentially professional
> military judgments.'"

*Id.* at 58 (citations omitted).   The Supreme Court also rejected the plaintiff's attempt to

characterize the case as a "straightforward personnel decision," pointing out that "[b]y whatever

name it is called, it is a decision of command." *Id.* at 59.

As in *Shearer,* plaintiffs' case strikes at the heart of the public policy considerations

underlying *Feres*, *Chappell*, and *Stanley*.  Despite plaintiffs' efforts to characterize this case as a

suit about rape and retaliation, that is not the basis of their legal claims.  Plaintiffs have not

sought damages from any of the service members who allegedly raped or retaliated against them,

and they do not allege that defendants personally participated in the alleged sexual assaults or

retaliatory actions.  *See* Defs.' Reply at 1.  Rather, by alleging that the wrongdoing arose out of a

hostile climate created – or at least, not effectively addressed and therefore, tacitly sanctioned –

by defendants, Am. Compl. ¶ 5, plaintiffs have asked the Court to review a decade's worth of

military management decisions, including: allowing individuals with criminal convictions to enlist in the military; refusing or delaying compliance with congressional mandates; ensuring that military, not civilian, authorities investigate and prosecute rapes; allowing convicted rapists and sexual assailants to be honorably discharged; permitting destruction of forensic evidence; and allowing military Command to rely on a nonjudicial punishment process for allegations of rape, sexual assault, and sexual harassment and to charge alleged rapists and sexual assailants with adultery instead of rape. *See* Am. Compl. ¶¶ 200–222.

During the motion hearing, plaintiffs focused particularly on defendants' alleged failure to comply with congressional and statutory mandates. Tr. of Mot. Hr'g at 23–35 ("Tr."). They argued that redressing these failures and violations would not intrude into military decision-making because Congress made the decision in question, the Pentagon has refused to comply, and the lawsuit is simply seeking to hold the defendants responsible for *that*. Tr. at 25–28. But this distinction does not help plaintiffs' case.

First of all, the lawsuit is not crafted as plaintiffs now try to describe it. This is not a challenge to executive action brought under the Administrative Procedure Act; this is a suit for damages in which the Court is being asked to create a remedy under *Bivens*. Second, even if it could be shown that defendants intentionally refused to comply with congressional directives, reviewing this refusal would require the Court to analyze why military management decided to ignore the directives and whether those decisions were justified. Under *Shearer*, the Court must decline to adjudicate a case where commanding officers "would have to stand prepared to convince a civilian court of the wisdom" of their decisions. 473 U.S. at 58. The Supreme Court has rejected a "test for liability that depends on the extent to which particular suits would call into question military discipline and decisionmaking [because such a test] would itself require

17

judicial inquiry into, and hence intrusion upon, military matters. . . . Even putting aside the risk of erroneous judicial conclusions (which would becloud military decisionmaking), the mere process of arriving at correct conclusions would disrupt the military regime." *Stanley*, 483 U.S. at 682–83.[4]

Plaintiffs point out that the "military and its leadership need to remain subject to civilian control." Pls.' Opp. at 20. But that civilian control is constitutionally vested in the legislative and executive branches, the "branches of the government which are periodically subject to electoral accountability." *Chappell*, 462 U.S. at 302. As plaintiffs have noted, Congress has held numerous hearings on and issued mandates regarding the issue of sexual assault in the military. Am. Compl. ¶¶ 213, 216, 219–22. Thus, as the Supreme Court said in *Chappell*: "Taken together, the unique disciplinary structure of the military establishment and [this congressional] activity in the field constitute 'special factors' which dictate that it would be inappropriate to provide" plaintiffs a *Bivens* remedy in this circumstance. 462 U.S. at 304.

Therefore, the Court finds that a *Bivens* remedy is unavailable to plaintiffs both because their injuries arose from, or were suffered in the course of activity incident to, their military service, and because their particular claims raise the very public policy considerations underlying the abstention doctrine. This decision is not meant to question in any way the seriousness of the alleged sexual assaults and retaliation, to minimize plaintiffs' suffering, or to express any doubts about the allegations that the culture and management of the military has allowed this kind of

---

4   Plaintiffs assert that their case is distinguishable from a virtually identical case that was dismissed by the District Court for the Eastern District of Virginia in 2011 on the grounds that the suit was barred by *Chappell* and *Stanley*. *See Cioca v. Rumsfeld*, No. 1:11-cv-151, *appeal docketed*, No. 12-1065 (4th Cir. Jan. 13, 2012). They explain that since *Cioca*, they have supplemented their pleading with allegations more sharply focused on defendants' failure to comply with congressional mandates. *See* Tr. at 36. But that does not save their case from dismissal.

harassment and retaliation to persist.  All parties agree that "[t]here is no question that allegations of rape and sexual assault by service-members should be investigated and, if appropriate, prosecuted, and that victims of any such assaults should be treated with care and compassion, and receive the full range of available support services and medical treatment to address their needs."  Defs.' Mem at 1.  But the fact remains, as plaintiffs recognized in open court, that "the constitution vests the ultimate power to decide how the military should run itself in Congress." Tr. at 17.  Notwithstanding the deeply troubling nature of the allegations in plaintiffs' complaint, the Court is not free to infer a *Bivens* remedy under these circumstances.  "The special status of the military has required, the Constitution contemplated, Congress has created, and this Court has long recognized two systems of justice, to some extent parallel:  one for civilians and one for military personnel."  *Chappell*, 462 U.S. at 303–04.  As the Fifth Circuit reluctantly observed in *Stanley,* "[d]espite the apparent harshness of the application of *Feres* to the facts before us, we are compelled to conclude" that a *Bivens* remedy is unavailable to plaintiffs.  639 F.2d at 1153.[5]

## II.  Qualified Immunity

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

---

[5]      After the hearing, plaintiffs submitted a forthcoming law review article as supplemental authority for their argument that the *Feres* doctrine should not bar their case.  *See* Francine Banner, *Immoral Waiver: Judicial Review of Intra-Military Sexual Assault Claims*, Lewis & Clark L. Rev. (forthcoming 2013), Ex. A to Pls.' Notice of Supplemental Auth. [Dkt. # 12].  The article urges the Supreme Court to revisit the *Feres* doctrine, especially as it has been applied to claims of sexual assault and harassment, and suggests how the "Don't Ask, Don't Tell" cases can be used to effectuate this revision.  *Id.* at 7, 39-49.  However, as the article notes, the Supreme Court has recently denied this request.  *See id.* at 38 n. 262 (explaining that the plaintiff in *Witt ex rel. Estate of Witt v. United States*, 379 Fed.App'x. 559 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 3058 (2011), "petitioned the Supreme Court for certiorari, urging the Court to revisit *Feres*. Certiorari was denied without comment.").  Therefore, since this article focuses on what the law should be and not what the law currently is, it does not alter the Court's abstention analysis.

which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).[6] "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*" or vicarious liability; rather "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

To overcome defendants' claim to qualified immunity, plaintiffs' complaint must contain sufficient factual matter, accepted as true, to support that conclusion. *See Iqbal*, 556 U.S. at 673 ("the sufficiency of [the] pleadings is both inextricably intertwined with and directly implicated by the qualified immunity defense") (internal quotation marks and citations omitted). They must plead their case based on factual allegations; the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*, quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). And, the factual allegations must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

Plaintiffs contend that defendants are not entitled to qualified immunity because they knowingly violated plaintiffs' clearly established rights, and they violated their duty to protect plaintiffs from sexual assault and retaliation. They note that federal officials in charge of

---

6    In their pleadings, defendants did not challenge whether plaintiffs have a clearly established constitutional (1) "right to bodily integrity" under the Fifth Amendment, Am. Compl. ¶¶ 223–26; (2) right to "justice" and to be free from unfair termination and mistreatment under the Fifth Amendment, Am. Compl. ¶¶ 227–30; (3) right "to be free from rape, sexual assault and sexual harassment under the Fifth Amendment," Am. Compl. ¶¶ 231–34; (4) right to report sexual assault, sexual harassment and rape without suffering retaliation and adverse employment actions under the freedom of speech clause of the First Amendment, Am. Compl. ¶¶ 235–37; or (5) right to have a jury determine the fate of perpetrators of sexual assault and retaliatory acts under the Seventh Amendment, Am. Compl. ¶¶ 238–40. And, for example, it is certainly not clear to the Court that the Seventh Amendment accords jury trial rights to the victim. But it was not necessary to reach these questions in order to decide the motion on the grounds that were presented, and therefore the Court has only assumed, without deciding, that these rights are clearly established.

prisoners and involuntarily committed mental patients have a constitutional duty to protect them and ensure "reasonable safety" from themselves and others.  *See DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189, 199–200.  But they have not met the *Iqbal* requirements.

A. <u>Plaintiffs Have Failed To Allege That Defendants Purposefully Violated Their Clearly Established Constitutional Rights</u>

Even if one accepts plaintiffs' representation that they are alleging individual misfeasance on the part of defendants as opposed to mere vicarious liability for the acts of those under their supervision, plaintiffs have failed to plead enough facts to overcome defendants' qualified immunity.  Plaintiffs acknowledged at oral argument that their complaint must include factual allegations sufficient to plausibly suggest that defendants acted with purposeful intent, Tr. at 34, and that is the teaching of *Iqbal*.  556 U.S. at 677 (stating that to determine "whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required").

In *Iqbal*, a Pakistani Muslim who was arrested and detained by federal officials filed a *Bivens* suit against a number of government officials including the former Attorney General and the Director of the FBI.  *Id.* at 668.  He alleged that in contravention of the First and Fifth Amendments, the officials "knew of, condoned, and willfully and maliciously agreed to subject him to harsh conditions of confinement as a matter of policy, solely on account of his religion, race, and/or national origin and for no legitimate penological interest . . . that [the former Attorney General] was the principal architect of this invidious policy, and that [the then Director of the FBI] was instrumental in adopting and executing it."  *Id.* at 680–81 (internal quotation marks and citations omitted).  The Court held that the prisoner's pleadings failed to state a claim because some of his allegations were conclusory and not entitled to be accepted as true, and the

allegations that were factual in nature did not plausibly suggest that the defendants purposefully violated his clearly established constitutional rights.  *Id.* at 680–82.

As *Iqbal*, requires, the Court will consider the factual allegations in plaintiffs' complaint to determine if they plausibly suggest that defendants acted with purposeful intent.  When asked to point to the specific factual allegations in the complaint that suggest defendants purposefully violated plaintiffs' constitution rights, plaintiffs referred to defendants' failure to implement and comply with congressional mandates, Am. Compl. ¶¶ 219–222.  Tr. at 35.  Plaintiffs explained at the motions hearing that their contention is that defendants "knowingly and intentionally ignored the will of Congress . . . . They knew when they were ignoring what Congress directed them to do, they knew that the victims of that conduct were going to be the rape victims . . . they knew by not doing what they'd been told to do by Congress, that additional service members would be raped, additional servicemembers would be retaliated against."  Tr. at 35–36; *see also* Am. Compl. ¶¶ 204–06, 212, 216, 219, 221–22; Pls.' Opp. at 22–26.  Accepting the truth of these allegations, they do not show, or even intimate that defendants purposefully deprived plaintiffs of their constitutional rights or "acted on account of a constitutionally protected characteristic." *Iqbal*, 556 U.S. at 683.  At most, plaintiffs only allege that defendants "knew that their inaction and refusal to abide by Congressional mandates would result in ongoing Constitutional deprivations."  Pls.' Opp. at 23.  However, as the Supreme Court said in *Iqbal*, "purpose rather than knowledge is required to impose *Bivens* liability" on a government official otherwise entitled to qualified immunity, and plaintiffs have not alleged the purposeful intent necessary to overcome defendants' entitlement to qualified immunity.  *Iqbal*, 556 U.S. at 677.

B.  Plaintiffs Have Failed To Show That Defendants Had A Duty To Protect Them From
Their Injuries

Plaintiffs also assert that defendants had a duty to protect them from sexual assault and
retaliation. They submit that qualified immunity is therefore not available because
"servicemembers are more akin to prisoners than to civilians in terms of their ability to engage in
self-help against Constitutional deprivations."  Pls.' Opp. at 23.

The law regarding prisoners is not in dispute. "[W]hen the State takes a person into its
custody and holds him there against his will, the Constitution imposes upon it a corresponding
duty to assume some responsibility for his safety and general well-being. . . . The affirmative
duty to protect arises . . . from the limitation which [the State] has imposed on [the individual's]
freedom to act on his own behalf."  *DeShaney*, 489 U.S. at 199–200, citing *Estelle v. Gamble*,
429 U.S. 97 (1976) and *Youngberg v. Romeo*, 457 U.S. 307 (1982).  In *Estelle*, the Supreme
Court held that the Eighth Amendment's prohibition against cruel and unusual punishment, made
applicable to the states through the Fourteenth Amendment's Due Process Clause, required the
state to provide adequate medical care to incarcerated prisoners.  429 U.S. at 103–04.  Since the
prisoner is unable "by reason of the deprivation of his liberty to care for himself, it is only just
that the State be required to care for him."  *Id.*  The Court in *Youngberg* extended this analysis
and held that "the substantive component of the Fourteenth Amendment's Due Process Clause
requires the State to provide involuntarily committed mental patients with such services as are
necessary to ensure their 'reasonable safety' from themselves and others."  *DeShaney*, 489 U.S.
at 198, citing *Youngberg*, 457 U.S. at 314–25.

But plaintiffs' assertion that service members should be viewed as prisoners is at odds
with the facts and the law.  First and foremost, service members choose to enter the military.
They may be limited in their ability to freely move, and to resist authority, but they enter into the

arrangement knowingly giving up some of these rights.  Further, plaintiffs do not provide any legal support for the analogy they ask the Court to draw, and they do not distinguish the circuit decisions that have rejected a similar argument, made in the common law tort context, that the government has a duty to protect others from harm inflicted by service members because of the control the government exercises over military personnel.  *See* Defs.' Mem. at 12–13 and Defs.' Reply at 7–8, citing *Hallett v. U.S. Dep't. of Navy*, 850 F. Supp. 874, 879 (D. Nev. 1994), quoting *Doggett v. United States*, 875 F.2d 684, 693 (9th Cir. 1989) ("The Ninth Circuit, however, has made clear that 'the military relationship does not constitute a special relationship merely because of the military command's general right to control the conduct of military personnel.'"); *Wise v. United States*, 8 F. Supp. 2d 535, 549 (E.D. Va. 1998) (rejecting the argument that under tort law principles, soldiers have a "special relationship" with the government sufficient to impose a duty on the government to control the off-duty conduct of soldiers).

Therefore, the Court finds that defendants are entitled to qualified immunity because plaintiffs have not provided factual allegations sufficient to plausibly suggest that any of these defendants *purposefully* violated the plaintiffs' clearly established constitutional rights.[7] Additionally, they have not demonstrated that defendants had a constitutional duty to protect them from sexual assault and retaliation committed by other service members.

---

7       In a footnote to the one sentence conclusion found on the last page of defendants' memorandum in support of their motion to dismiss, defendants assert that the claims of all but four plaintiffs (Klay, McCoy, Blumer, and Everage) are barred by the District of Columbia's statute of limitations. Defs.' Mem. at 16 n.6.  In another footnote at the end of their reply brief, defendants contend that since plaintiffs did not respond to this statute of limitations argument in their opposition to the motion, the Court should consider the point to be conceded.  Defs.' Reply at 8 n.6.  Since it can hardly be said that the issue was advanced or briefed in any substantive way as part of the defendants' motion to dismiss, the Court will decline to deem plaintiffs' silence on that point to be a concession.

## CONCLUSION

Accordingly, the Court will grant defendants' motion to dismiss because Supreme Court precedent requires the Court to abstain from inferring a *Bivens* remedy for plaintiffs under these circumstances and plaintiffs have not overcome defendants' entitlement to qualified immunity.[8]


AMY BERMAN JACKSON
United States District Judge

DATE: February 7, 2013

---

[8]    While plaintiffs offered to amend their complaint during oral argument, Tr. at 31–32, they have never filed a motion to amend attaching any amended complaint, much less one that could – after the several chances they have had already – cure the problems at the heart of this action.